62 P.3d 489 (2003)
148 Wash.2d 564
STATE of Washington, Respondent,
v.
Matthew Glynn O'NEILL, Petitioner.
No. 70945-9.
Supreme Court of Washington, En Banc.
Argued November 29, 2001.
Decided January 30, 2003.
*493 Nielsen, Broman & Assoc., Dana Nelson, Seattle, for Petitioner.
David McEachran, Whatcom County Prosecutor, Rosemary Kaholokula, Deputy, Bellingham, for Respondent. *490 *491
*492 MADSEN, J.
Defendant Matthew Glynn O'Neill was parked in the parking lot of a closed business that had been recently burglarized when a police officer approached and, among other things, asked him for identification. O'Neill responded that he had been driving while his license was revoked and gave the officer what turned out to be a false name. The officer asked O'Neill to step out of the vehicle. When O'Neill complied, the officer saw what he believed to be drug paraphernalia (a "cook spoon") on the floorboard. The officer then repeatedly asked for consent to search the car. O'Neill eventually agreed to the search and the officer found more drug paraphernalia (a pipe) and cocaine. The officer then arrested O'Neill. O'Neill successfully moved to suppress the evidence. The State appealed and the Court of Appeals reversed.
We hold that the police officer's action in approaching O'Neill and asking for identification did not violate article I, section 7 of the Washington Constitution. We also hold that O'Neill was not seized until the officer asked O'Neill to step out of his vehicle. At that point, O'Neill was detained, and the detention was constitutionally permissible. We affirm the Court of Appeals' holding that the evidence of the "cook spoon" is admissible under the "plain view" doctrine. We also hold that under article I, section 7 a warrantless search incident to arrest requires as a prerequisite to the search a lawful custodial arrest as the authority of law justifying the search. Probable cause alone is insufficient. We affirm the superior court's determination that there was no valid consent to the search of the vehicle. Finally, we hold that under article I, section 7 the inevitable discovery' *494 rule does not apply in these circumstances to allow for admissibility of the pipe and cocaine.

FACTS
The findings of fact entered following the suppression hearing are unchallenged. The rule in Washington is that challenged findings entered after a suppression hearing that are supported by substantial evidence are binding, and, where the findings are unchallenged, they are verities on appeal. See, e.g., State v. Hill, 123 Wash.2d 641, 647, 870 P.2d 313 (1994); State v. Horrace, 144 Wash.2d 386, 391-92, 28 P.3d 753 (2001); State v. Ross, 141 Wash.2d 304, 309, 4 P.3d 130 (2000); State v. Kinzy, 141 Wash.2d 373, 382 n. 19, 5 P.3d 668 (2000), cert. denied, 531 U.S. 1104, 121 S.Ct. 843, 148 L.Ed.2d 723 (2001); State v. Finch, 137 Wash.2d 792, 856, 975 P.2d 967 (1999); State v. Mendez, 137 Wash.2d 208, 214, 970 P.2d 722 (1999); State v. Armenta, 134 Wash.2d 1, 9, 948 P.2d 1280 (1997); State v. Broadaway, 133 Wash.2d 118, 130, 942 P.2d 363 (1997). Decisions to the contrary are overruled insofar as they are inconsistent. E.g., State v. Thorn, 129 Wash.2d 347, 351, 917 P.2d 108 (1996); State v. Crane, 105 Wash.App. 301, 306, 19 P.3d 1100 (2001); State v. Knox, 86 Wash.App. 831, 838, 939 P.2d 710 (1997).
The unchallenged findings in this case establish that on June 7, 1999, Sergeant West was traveling on a road in Bellingham when he saw a car parked in front of a store that had been closed for about an hour. Sergeant West knew that it had been burglarized twice in the previous month. West pulled up behind the car and activated his spotlight in order to see the license plate and run a computer check on the plate. He ran the check, and learned that the vehicle had been impounded within the previous two months due to a drug situation. West noticed that the windows of the parked vehicle were fogged over, and he formed the opinion that someone was in the car. He also believed the car had been there for a period of time sufficient for the windows to fog.
Sergeant West approached the driver's side of the car and shined the light from his flashlight in the driver's face. The driver was later identified as O'Neill. West asked Mr. O'Neill to roll the window down, which he did. Sergeant West asked Mr. O'Neill what he was doing there, and O'Neill answered that he had come from Birch Bay and his car had broken down. He said that his car would not start, and that he was waiting for a friend to come with jumper cables. West asked Mr. O'Neill to try to start the car. O'Neill tried, but the car would not start.
West then asked O'Neill for identification. Mr. O'Neill said that he did not have any on him, and then stated that his driver's license had been revoked. West asked for registration and insurance papers. Mr. O'Neill produced registration that showed that the vehicle was registered to Harold Macomber. There was a handwritten date of birth on the registration. Sergeant West asked O'Neill if he was Macomber, and O'Neill said he was. West asked O'Neill to step from the vehicle and then patted him down for identification.
When Mr. O'Neill got out of the car, Sergeant West saw a spoon on the floorboard next to the driver's side. West saw a substance on the spoon that looked granular with a slickness or wet look. Based upon his training and experience, West thought that a narcotic had been cooked on the spoon. When West asked Mr. O'Neill about the spoon, O'Neill said that it was an ice cream spoon.
West then asked O'Neill for consent to search the vehicle. Mr. O'Neill said "no" and said that Sergeant West needed a warrant to search the car. West responded that he did not need a warrant but could simply arrest O'Neill for the drug paraphernalia and search the car incident to that arrest. West asked for consent again. The discussion went back and forth several times, with O'Neill eventually consenting. West got into the car and saw a pipe that he recognized as drug paraphernalia on the driver's seat. He moved the pipe and sat down. From a sitting position, he could see a baggie in the open containing what he believed to be cocaine.
West arrested O'Neill, who was charged with unlawful possession of a controlled substance. *495 O'Neill moved for suppression of the evidence of the "cook spoon," the pipe and the cocaine. On September 2, 1999, the superior court granted the motion, which had the practical effect of terminating the case against O'Neill. The court ruled that the search of the car was invalid under the fourth amendment to the United States Constitution because O'Neill did not give valid consent to the search. The court also rejected the State's arguments that evidence obtained during that search was admissible under the "inevitable discovery" rule, and that the pipe and cocaine were seized incident to a lawful arrest. Although the superior court concluded that the "cook spoon" was admissible evidence under the Fourth Amendment, it suppressed the evidence under article I, section 7 of the Washington State Constitution. The court reasoned that because the officer had no probable cause or reasonable articulable suspicion that a crime was in progress or had been committed at the time he asked for identification, the state constitutional provision was violated and any evidence discovered thereafter is inadmissible and must be suppressed.
The State appealed and the Court of Appeals reversed. O'Neill's petition for discretionary review was granted by this court.

ANALYSIS
The first issue is whether under article I, section 7 Mr. O'Neill was seized prior to Sergeant West's request that O'Neill get out of the vehicle. We conclude that he was not. Accordingly, there is no need to discuss, as the Court of Appeals did, whether Sergeant West's conduct prior to that point was justified by the community caretaking exception to the warrant requirement.
Under article I, section 7, a person is seized "`only when, by means of physical force or a show of authority'" his or her freedom of movement is restrained and a reasonable person would not have believed he or she is (1) free to leave, given all the circumstances, State v. Young, 135 Wash.2d 498, 510, 957 P.2d 681 (1998) (quoting State v. Stroud, 30 Wash.App. 392, 394-95, 634 P.2d 316 (1981) and citing United States v. Menden hall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)), or (2) free to otherwise decline an officer's request and terminate the encounter, see Florida v. Bostick, 501 U.S. 429, 436, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); Thorn, 129 Wash.2d at 352, 917 P.2d 108. The standard is a "a purely objective one, looking to the actions of the law enforcement officer." Young, 135 Wash.2d at 501, 957 P.2d 681 (emphasis added). Mr. O'Neill has the burden of proving that a seizure occurred in violation of article I, section 7. Young, 135 Wash.2d at 509, 957 P.2d 681; Thorn, 129 Wash.2d at 354, 917 P.2d 108; Knox, 86 Wash.App. at 838, 939 P.2d 710.
Before assessing the officer's actions in this case, we note that underlying much of O'Neill's argument appears to be the premise that an officer cannot approach citizens when the officer has suspicions of possible criminal activity or engage in investigation unless the suspicion rises to the level justifying a Terry stop. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). O'Neill reasons that if an officer is investigating suspicious circumstances, the officer cannot question the driver of the car and ask for identification unless those suspicions rise to the level necessary for a Terry stop.
That premise is contrary to this court's decision in Young, and contrary to the principle that a seizure depends upon whether a reasonable person would believe, in light of all the circumstances, that he or she was free to go or otherwise end the encounter. Whether a seizure occurs does not turn upon the officer's suspicions. Whether a person has been restrained by a police officer must be determined based upon the interaction between the person and the officer. See Knox, 86 Wash.App. at 839, 939 P.2d 710 (subjective intent of police is irrelevant to the question whether a seizure occurred unless it is conveyed to the defendant) (citing Mendenhall, 446 U.S. at 554, 100 S.Ct. 1870).
Not only is the nature of the officer's subjective suspicion generally irrelevant to the question whether a seizure has occurred under Terry and this court's decisions, there are sound reasons why it should be irrelevant to that question. As this court said in Young: *496 The Mendenhall Court ... said, "... characterizing every street encounter between a citizen and the police as a `seizure,' while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices." Id. at 554[, 100 S.Ct. 1870]. Thus, it is well-established that "[e]ffective law enforcement techniques not only require passive police observation, but also necessitate their interaction with citizens on the streets." [State v. Tucker,] [136 N.J. 158,] 642 A.2d[401,] 406 [1994]....
Young, 135 Wash.2d at 511, 957 P.2d 681. Young, of course, was analyzed solely under article I, section 7, and thus these comments apply here. And, as the Court in Mendenhall continued:
The Court has on other occasions referred to the acknowledged need for police questioning as a tool in the effective enforcement of the criminal laws. "Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished. Haynes v. Washington, 373 U.S. 503, 515[, 83 S.Ct. 1336, 1344, 10 L.Ed.2d 513]." Schneckloth v. Bustamonte, 412 U.S. [218,] 225[, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973) ].
Mendenhall, 446 U.S. at 554, 100 S.Ct. 1870; see also State v. Stroud, 30 Wash.App. 392, 395-96, 634 P.2d 316 (1981).
Young provides a good example. After the officer had completed a conversation with the defendant and had driven down the street, he determined from a criminal history records check that the defendant had a history of police contacts for drug-related incidents. This raised the officer's concerns about the defendant. Young, 135 Wash.2d at 512, 957 P.2d 681. The officer also saw the defendant peering down the street after him in an evident attempt to see what the officer was doing, behavior suggesting a check to see if "`the coast was clear.'" Id. All of this occurred in an area known for drug-related activity. Id. This court said: "Based on the totality of the circumstances, the deputy acted reasonably in seeking to renew his contact with" the defendant by turning his car around, driving toward the defendant and shining his spotlight on him. Id. Significantly, the court found no seizure had occurred at that point. Thus, the Young court recognized that despite the officer's suspicions and his further investigation in light of those suspicions, no seizure occurred.
Citizens of this state expect police officers to do more than react to crimes that have already occurred. They also expect the police to investigate when circumstances are suspicious, to interact with citizens to keep informed about what is happening in a neighborhood, and to be available for citizens' questions, comments, and information citizens may offer. Of course, if a police officer's conduct or show of authority, objectively viewed, rises to the level of a seizure, that seizure is valid only where there are "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the detention of the person. Terry, 392 U.S. at 21, 88 S.Ct. 1868. The officer's reasonable suspicions are, therefore, relevant once a seizure occurs, and relate to the question whether the seizure is valid under article I, section 7.
Accordingly, we reject the premise that under article I, section 7 a police officer cannot question an individual or ask for identification because the officer subjectively suspects the possibility of criminal activity, but does not have a suspicion rising to the level to justify a Terry stop.[1] Once a seizure is *497 found, however, the reasonableness of the officer's suspicion and the factual basis for it are relevant in deciding the validity of the seizure.
There is no issue of physical force in this case, so the next question is whether a reasonable person in the defendant's position would have believed he or she was free to go or otherwise terminate the encounter, given the actions of the officer. Young, 135 Wash.2d at 510-11, 957 P.2d 681. Whether there was any show of authority on the officer's part, and the extent of any such showing, are crucial factual questions in assessing whether a seizure occurred.
As the Court of Appeals has properly pointed out:
Where an officer commands a person to halt or demands information from the person, a seizure occurs. [Mendenhall, 446 U.S. at 554, 100 S.Ct. 1870]; State v. Gleason, 70 Wash.App. 13, 17, 851 P.2d 731 (1993). But no seizure occurs where an officer approaches an individual in public[[2]] and requests to talk to him or her, engages in conversation, or requests identification, so long as the person involved need not answer and may walk away.
State v. Cormier, 100 Wash.App. 457, 460-61, 997 P.2d 950 (2000) (emphasis added); see Mendenhall, 446 U.S. at 555, 100 S.Ct. 1870.
As noted, O'Neill has not challenged any of the findings, and thus they are verities for purposes of this review. The superior court's findings establish that the officer issued no orders or commands, and made no demands.[3]
When Sergeant West pulled into the parking lot he shined his spotlight on O'Neill's car. No seizure occurred at that point. Young, 135 Wash.2d at 510-13, 957 P.2d 681. West then approached the car and shined a flashlight into it, illuminating the driver and the passenger compartment. The use of a flashlight to illuminate at night what is plainly visible during the day is not an unconstitutional intrusion into a citizen's privacy interests. Young, 135 Wash.2d at 514 n. 8, 957 P.2d 681. As Young notes, this court in State v. Rose, 128 Wash.2d 388, 909 P.2d 280 (1996) reasoned that use of a flashlight is not an intrusive method of viewing what is there to be seen but for the dark of night. Young, 135 Wash.2d at 514 n. 8, 957 P.2d 681 (quoting Rose, 128 Wash.2d at 398-99, 909 P.2d 280). A flashlight is, instead, an exceedingly common device that can do no more than reveal what would be visible in natural light. This court concluded: "[W]e hold that the fact that a flashlight is used does not transform an observation which would fall within the open view doctrine during daylight into an impermissible search simply because darkness falls." Rose, 128 Wash.2d at 398-99, 909 P.2d 280, quoted in Young, 135 Wash.2d at 513 n. 8, 957 P.2d 681. Thus, in Young, this court found no disturbance of private affairs under article I, section 7 where a police officer shined a spotlight on a person in a public street at night, under the same reasoning employed in Rose. Sergeant West's use of a flashlight to see what would be observable in daylight was not an unreasonable intrusion into O'Neill's private affairs.
Sergeant West then asked O'Neill to roll his window down. It is not improper for a law enforcement officer to engage a citizen in conversation in a public place. Young, 135 Wash.2d at 511, 957 P.2d 681. O'Neill was parked in a public place. The occupant of a car does not have the same *498 expectation of privacy in a vehicle parked in a public place as he or she might have in a vehicle in a private locationhe or she is visible and accessible to anyone approaching. Significantly, this court has concluded that there was no seizure of a person in a vehicle parked at night in the parking lot of a closed public park, where a police officer approached the vehicle after seeing a light in it, and asked, "`[Where is the pipe.]'" Thorn, 129 Wash.2d at 349, 917 P.2d 108. Thorn is a Fourth Amendment case, but it demonstrates that no unreasonable intrusion by police occurs when an officer approaches the driver of an automobile parked in a public parking lot and engages him or her in conversation. Additionally, the Court of Appeals determined, under article I, section 7 and the Fourth Amendment, that an officer who approached a vehicle parked on a ferry with the driver apparently asleep, asked repeatedly for the driver to roll the window down, and asked several questions about whether the driver was okay, did not effect a seizure. Knox, 86 Wash.App. at 832, 939 P.2d 710. The court concluded that where a vehicle is parked in a public place, the distinction between a pedestrian and the occupant of a vehicle dissipates. Id. We agree.
The occupant is free, of course, to refuse an officer's request to open the window, and is under no obligation to engage in conversation with the officer. By the same token, the occupant is just as free to open a window and engage in conversation. The officer's approach and conversation with O'Neill did not, because O'Neill was inside a vehicle, rise to the level of an unconstitutional intrusion into private affairs.
O'Neill next challenges the propriety of Sergeant West's request that he try to start the vehicle. The unchallenged findings do not suggest any show of authority that would lead a reasonable person to believe he was being detained as a result of this request.
The next question is whether Sergeant West's request for identification was an unconstitutional intrusion into O'Neill's private affairs under article I, section 7. The superior court felt bound by the Court of Appeals' decision in State v. Markgraf, 59 Wash.App. 509, 798 P.2d 1180 (1990). There, police had received a tip that a woman might be in trouble in a parked car. The Court of Appeals reasoned that under their community caretaking function the officers properly approached the car to determine whether the occupants were experiencing trouble. However, the court in Markgraf further reasoned, once the officers determined the occupants were not in need of assistance, the officers' subsequent request for identification violated the state constitution since the officers had no reasonable suspicion justifying a Terry stop.
As the Court of Appeals in this case observed, Markgraf was decided before this court's decisions in Armenta. O'Neill, 104 Wash.App. at 864, 17 P.3d 682. Markgraf also was decided before Young. In Young, we concluded that for purposes of article I, section 7,
"[a] police officer's conduct in engaging a defendant in conversation in a public place and asking for identification does not, alone, raise the encounter to an investigative detention." State v. Armenta, 134 Wash.2d 1, 11, 948 P.2d 1280 (1997).
This view comports with the Supreme Court's statement in Mendenhall that "not every encounter between a police officer and a citizen is an intrusion requiring an objective justification." Mendenhall, 446 U.S. at 553, 100 S.Ct. 1870.
Young, 135 Wash.2d at 511, 957 P.2d 681.[4] We adhere to our analysis in Young.
Sergeant West's actions in their entirety, viewed objectively, do not warrant the conclusion there was a show of authority *499 amounting to a seizure prior to the request that O'Neill exit the car. It is important to bear in mind that the relevant question is whether a reasonable person in O'Neill's position would feel he or she was being detained. The reasonable person standard does not mean that when a uniformed law enforcement officer, with holstered weapon and official vehicle, approaches and asks questions, he has made such a show of authority as to rise to the level of a Terry stop. If that were true, then the vast majority of encounters between citizens and law enforcement officers would be seizures. Instead, as this court noted in Young when it approved the analysis in Mendenhall:
"Examples of circumstance that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.... In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person."
Young 135 Wash.2d at 512, 957 P.2d 681 (citations omitted) (quoting Mendenhall, 446 U.S. at 554-55, 100 S.Ct. 1870); see also State v. Ellwood, 52 Wash.App. 70, 73, 757 P.2d 547 (1988) (generally, "the approach of a uniformed officer carrying a gun is not in itself a sufficient show of force to instill in one the reasonable belief that he [or she] is being detained"). The actions of the officer in this case, up to and including his request for identification, do not come close to the circumstances described in Young.
When Sergeant West asked O'Neill for identification, O'Neill responded by saying that his driver's license was revoked. (He had already told the officer that he had driven the vehicle to the parking lot.) Sergeant West then asked for registration and insurance papers. When O'Neill produced a registration in the name of Macomber with a handwritten birth date, West asked O'Neill to get out of the car to check for identification.
At that point, Sergeant West had probable cause to believe that O'Neill was involved in criminal activity: driving while his license was revoked. Because probable cause exceeds the reasonable suspicion standard for a Terry stop, there were, at the least, grounds for a valid Terry stop. Sergeant West then lawfully asked O'Neill to exit the vehicle. Once a driver has been validly stopped, a police officer may order him or her to get out of the vehicle, "regardless of whether the driver is suspected of being armed or dangerous or whether the offense under investigation is a serious one." Charles W. Johnson, Survey of Washington Search and Seizure Law: 1998 Update, 22 SEATTLE U.L.REV. 337, 461 (Fall 1998); see Pennsylvania v. Mimms, 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); State v. Belieu, 112 Wash.2d 587, 594-95, 773 P.2d 46 (1989); State v. Kennedy, 107 Wash.2d 1, 9, 726 P.2d 445 (1986). Such an intrusion is de minimis. Kennedy, 107 Wash.2d at 9, 726 P.2d 445. Sergeant West was therefore justified in asking O'Neill to exit the vehicle.[5] At that point, a reasonable person in O'Neill's position would not believe himself free to leave.
Once O'Neill opened the door and got out of the car, Sergeant West saw the "cook spoon" on the floorboard next to the driver's seat. The superior court held that under the Fourth Amendment the spoon was lawfully discovered in plain view. The State does not argue for a different analysis under the state constitution than applies under the federal constitution, and accordingly we apply the "plain view" analysis that applies under the federal constitution. See Nelson v. McClatchy Newspapers, Inc., 131 Wash.2d 523, 538, 936 P.2d 1123 (1997). The "plain view" doctrine is an exception to the warrant requirement that applies after police have intruded into an area in which there is a reasonable expectation of privacy. State v. Myers, 117 Wash.2d 332, 346, 815 P.2d 761 *500 (1991). The doctrine requires that the officer had a prior justification for the intrusion and immediately recognized what is found as incriminating evidence such as contraband, stolen property, or other item useful as evidence of a crime.[6]See Horton v. California, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); Texas v. Brown, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983).[7] Sergeant West was justified in asking O'Neill to exit the vehicle, saw the spoon on the floorboard next to the driver's seat, and, based upon his experience and training, recognized it as drug paraphernalia. The spoon was therefore admissible as evidence under the plain view exception.
As to the warrantless search of the car that followed, the State argues that this search was proper as a search incident to probable cause to arrest O'Neill either for driving while his license was revoked or for the drug paraphernalia. The State reasons that it makes no difference that the search preceded an arrest, relying on cases holding that a search incident to arrest may precede arrest provided that probable cause exists at the time of the search, and the search and arrest are contemporaneous. E.g., State v. Harrell, 83 Wash.App. 393, 400, 923 P.2d 698 (1996). The superior court ruled under the Fourth Amendment that there was no valid search incident to arrest. The Court of Appeals reversed this ruling, accepting the State's argument.
Here, Sergeant West did not arrest O'Neill for driving while his license was revoked, or for either possession or use of drug paraphernalia.[8] The Court of Appeals reasoned, however, that a search incident to arrest can occur before an actual custodial arrest so long as probable cause exists to arrest at the time of the search. State v. O'Neill, 110 Wash.App. 604, 608, 43 P.3d 522 (2002). That court concluded that Sergeant West had probable cause to arrest for possession of a controlled substance based on the residue on the spoon, and therefore a search incident to arrest was proper. We disagree.
Article I, section 7 provides greater protection of a person's right to privacy than the Fourth Amendment. State v. Ferrier, 136 Wash.2d 103, 111, 960 P.2d 927 (1998); State v. Hendrickson, 129 Wash.2d 61, 69 n. 1, 917 P.2d 563 (1996). The state provision recognizes a person's right to privacy with no express limitations. Ferrier, 136 Wash.2d at 111, 960 P.2d 927; State v. White, 97 Wash.2d 92, 110, 640 P.2d 1061 (1982). The right to be free from unreasonable governmental intrusion into one's private affairs encompasses automobiles and their contents. State v. Parker, 139 Wash.2d 486, 494, 987 P.2d 73 (1999); Hendrickson, 129 Wash.2d at 69 n. 1, 917 P.2d 563; City of Seattle v. Mesiani, 110 Wash.2d 454, 456-57, 755 P.2d 775 (1988).
It is also well settled that under article I, section 7 the search incident to arrest exception to the warrant requirement is narrower than under the Fourth Amendment.[9] For example, under article I, section 7 law enforcement officers cannot search *501 locked containers in a vehicle incident to arrest of the driver. State v. Fladebo, 113 Wash.2d 388, 779 P.2d 707 (1989); State v. Stroud, 106 Wash.2d 144, 152, 720 P.2d 436 (1986).
The exact formulation of when an arrest occurs justifying a search incident to arrest under the Fourth Amendment has sometimes been unclear. See generally Wayne A. Logan, An Exception Swallows a Rule: Police Authority To Search Incident to Arrest, 19 YALE L. & POL'Y REV. 381 (2001). However, for purposes of article I, section 7, the court has provided clear guidance:
Under article I, section 7, a lawful custodial arrest is a constitutionally required prerequisite to any search incident to arrest. State v. Cyr, 40 Wash.2d 840, 843, 246 P.2d 480 (1952), overruled on other grounds by State v. Ringer, 100 Wash.2d 686, 674 P.2d 1240 (1983). It is the fact of arrest itself that provides the "authority of law" to search, therefore making the search permissible under article I, section 7. Cyr, 40 Wash.2d at 843, 246 P.2d 480; see also State v. Michaels, 60 Wash.2d 638, 643, 374 P.2d 989 (1962) (citing with approval [Cyr ]). Thus, while the search incident to arrest exception functions to secure officer safety and preserve evidence of the crime for which the suspect is arrested, in the absence of a lawful custodial arrest a full blown search, regardless of the exigencies, may not validly be made. See, e.g., State v. Johnson, 71 Wash.2d 239, 242, 427 P.2d 705 (1967) (lawful arrest is a prerequisite to a lawful search); State v. Miles, 29 Wash.2d 921, 933, 190 P.2d 740 (1948) (if arrest is unlawful, search is unlawful).... It states the obvious to observe that where a person is not under arrest there can be no search incident thereto.
Parker, 139 Wash.2d at 496-97, 987 P.2d 73. Thus, probable cause for a custodial arrest is not enough. There must be an actual custodial arrest to provide the "authority" of law justifying a warrantless search incident to arrest under article I, section 7.
Because a search cannot occur without "authority of law," and the search incident exception to the warrant requirement is a narrow one, we conclude that the state constitution requires an actual custodial arrest before a search occurs. Otherwise, the search is in fact conducted without an arrest, and thus without authority of law existing at the time of the search. As recognized in Parker, it is the arrest, not probable cause to arrest, that constitutes the necessary authority of law for a search incident to arrest.
We note that the Court of Appeals cited one of this court's cases for the proposition that a search may precede the actual arrest where there is probable cause for the arrest, and the arrest is reasonably contemporaneous with the search. O'Neill, 104 Wash.App. at 861, 17 P.3d 682 (citing State v. Smith, 88 Wash.2d 127, 138, 559 P.2d 970 (1977)). The comments in Smith were dicta, since the arrest occurred well after the search, and the court concluded that the search was valid based upon exigent circumstances as well as pursuant to valid consent to the search. Smith, 88 Wash.2d at 138-40, 559 P.2d 970.
The origin of the principle stated in Smith is State v. Brooks, 57 Wash.2d 422, 357 P.2d 735 (1960), cited in Smith, 88 Wash.2d at 138, 559 P.2d 970. In Brooks the court said the issue was one of first impression, and adopted the reasoning of the California court in People v. Martin, 45 Cal.2d 755, 290 P.2d 855 (1955), that if there was reasonable cause before the arrest, it was immaterial whether the seizure of certain items preceded rather than followed the arrest. Brooks, 57 Wash.2d at 425, 357 P.2d 735. The California opinion was quoted at some length, and included the justification that if the person was innocent and the search convinced the officer his reasonable belief was wrong, it was to the advantage of the person searched not to be arrested; on the other hand, if the person searched was not innocent, "`security of his person, house, papers, or effects suffer[ed] no more from a search preceding his arrest than it would from the same search following it.'" Brooks, 57 Wash.2d at 426, 357 P.2d 735 (quoting People v. Simon, 45 Cal.2d 645, 648, 290 P.2d 531 (1955)).
The motion to suppress in Brooks was made pursuant to article I, section 7, but for several reasons we decline to follow that *502 decision. First, there was no discussion in Brooks of whether the state constitutional analysis is the same as under the Fourth Amendment. As noted, the court adopted the reasoning of the California court, but this court did not undertake any analysis of article I, section 7 itself. Second, the cases relied on by the California court are not relevant to our state constitutional provision, and, indeed, confirm that the decision in Brooks was not the result of a Washington state constitutional analysis. Martin cites Simon, 45 Cal.2d 645, 290 P.2d 531. Martin, 45 Cal.2d at 762, 290 P.2d 855. Simon cites six cases, State v. McDaniel, 115 Or. 187, 231 P. 965, 237 P. 373 (1925), which merely cites the following two cases that are also cited in Simon; State v. Reynolds, 101 Conn. 224, 125 A. 636 (1924), which was decided on state constitutional grounds and one state decisionand Connecticut's comparable constitutional provision differs from article I, section 7 (see Conn. Const. art. I, § 7, formerly § 8); Ingle v. Commonwealth, 204 Ky. 518, 264 S.W. 1088 (1924), decided under a state legislative enactment; Knight v. State, 171 Ark. 882, 286 S.W. 1013 (1926), resting on federal case law; Clark v. State, 78 Okla.Crim. 423, 149 P.2d 994 (1944), which does not appear on point for the propositionit involves a warrantless search pursuant to consent; and State v. Rotolo, 39 Wyo. 181, 270 P. 665 (1928), which is distinguishable because the particular evidence at issue was found in a search that occurred after the arrest (id. at 666, 667).
Moreover, the reasoning of the California court accepted in Brooks is suspect. Whether or not the search discloses any exculpatory or inculpatory evidence is not an appropriate consideration in determining whether a search incident to arrest is constitutionally valid. Finally, Brooks is not consistent with more recent analysis by this court recognizing the necessity of authority of law for a search under article I, section 7, and specifically, that a lawful, actual custodial arrest is a "constitutionally required prerequisite to any search incident to arrest." Parker, 139 Wash.2d at 496, 987 P.2d 73.
We hold that a valid custodial arrest is a condition precedent to a search incident to arrest as an exception to the warrant requirement under article I, section 7.[10]
In addition to the issues addressed above, the State also argued to the Court of Appeals that the superior court erred in ruling that there was no valid consent to search of the car and that the pipe and cocaine were not admissible under the inevitable discovery rule. In light of its resolution of the issues, the Court of Appeals did not reach these issues. Because we reverse the Court of Appeals' determination that the search of the car was valid as a search incident to arrest, these issues remain to be resolved, and we do so here. See RAP 13.7(b).
We first turn to the superior court's ruling that under the Fourth Amendment there was no consent to search the vehicle.
To show that valid consent to a search has been given, the prosecution must prove that the consent was freely and voluntarily given. Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); State v. Walker, 136 Wash.2d 678, 682, 965 P.2d 1079 (1998). Whether consent was voluntary or instead the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances. State v. Bustamante-Davila, 138 Wash.2d 964, 981, 983 P.2d 590 (1999); State v. Jensen, 44 Wash. App. 485, 488, 723 P.2d 443 (1986). Factors which may be considered in determining whether one has voluntarily consented include whether Miranda warnings (Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)) were given, the degree of education and intelligence of the individual, and whether he or she had been advised of the right to consent. Bustamante-Davila, 138 Wash.2d at 981-82, 983 P.2d 590. However, under the Fourth Amendment, when the subject of a search is not in custody and the question is whether consent is voluntary, knowledge of the right to refuse consent is not a prerequisite of a voluntary consent. *503 Schneckloth v. Bustamonte, 412 U.S. 218, 248-49, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).
Here, no Miranda warnings were given, but none were required. Mr. O'Neill was not advised that he had a choice whether to consent, but he was aware of the warrant requirement and aware in general that consent could be denied. The record does not disclose his level of intelligence or degree of education.
Although the factors identified in Bustamante-Davila are not particularly helpful in resolving the question of voluntariness, other circumstances show that the consent was not voluntary, as the superior court held. As noted, we consider the totality of the circumstances rather than merely applying a multifactor analysis.
The findings establish that when Sergeant West asked for consent to search the car, O'Neill's liberty was restrained in that while not in custody or under arrest, he was not free to leave, i.e., he had been seized within the meaning of Terry. While voluntary consent can be given even in a custodial situation, any restraint is a factor to consider. O'Neill denied consent, and stated that the officer had to have a warrant to search. West responded that he did not need a warrant, that he could simply arrest O'Neill for the drug paraphernalia and search incident to that arrest. West did not, however, arrest O'Neill for any offense at any time prior to searching the vehicle. O'Neill continued to refuse to grant consent, and the matter went back and forth several times. Only after Sergeant West repeatedly pressed the issue did O'Neill relent and give consent.
By his conduct, Sergeant West showed that he had no intention of arresting Mr. O'Neill and then searching incident to arrest. He simply claimed he could do so. Had he actually done so, he would not have needed Mr. O'Neill's consent to search the vehicle. Thus, the only reason for the representations that he could and would simply arrest O'Neill and search incident to arrest if he did not obtain consent was to obtain that consent.
The Court has noted that "consent" granted "only in submission to a claim of lawful authority" is not given voluntarily. Schneckloth, 412 U.S. at 233, 93 S.Ct. 2041 (citing Bumper, 391 U.S. at 548-49, 88 S.Ct. 1788) (emphasis added). In Bumper, the Court reasoned that where an officer claimed authority to conduct a valid search without consent, he effectively stated that the individual asked to consent had no right to resist the search. Bumper, 391 U.S. at 550, 88 S.Ct. 1788 (in context of claim of authority to search a home under a warrant; at trial the state prosecution relied upon consent and not upon a warrant). Cf. Rouse v. State, 643 So.2d 696, 698 (Fla.Ct.App.1994) (consent was not voluntary where individual repeatedly refused a request to search and the officer only obtained consent by saying he would wait as long as it took to determine if drugs were present and he would call in a canine unit to sniff for drugs).
The State, however, relies on State v. Murray, 84 Wash.2d 527, 527 P.2d 1303 (1974) for the proposition that consent was not vitiated where officers represented that they could obtain a search warrant if the individual did not consent, and said that they would leave an officer at the premises while doing so. The State suggests the same is true where an officer informs an individual that a search incident to arrest can be made if consent is not granted.
Murray is not helpful because the court did not address the voluntariness of the consent in the case. Nonetheless, we acknowledge that not every advisement of authority to search in the absence of consent vitiates any consent given. For example, in Commonwealth v. Mack, 568 Pa. 329, 796 A.2d 967, 970-71 (2002), the court distinguished Bumper on the ground that, unlike the situation in Bumper, the officers informed the appellant that they did not possess a warrant, that she was free to decline permission to search, and that if she refused permission they would have to get a search warrant. The court observed that the statement that the officers would have to get a warrant was a factor to consider in assessing voluntariness, but concluded that the officers simply advised the appellant, truthfully, of the consequences of denying permission. 796 A.2d at 971.
*504 Here, Sergeant West did not merely advise O'Neill of the consequences of refusal. Instead, in response to O'Neill's contention that West could not search without a warrant, West claimed that he could search without a warrant regardless of whether consent was given. As noted, however, for whatever reason West was not inclined to effect an arrest prior to searching the vehicle. He thus used the claim that he could search in any event to pressure O'Neill to consent, i.e., to give in because it was futile not to. Moreover, Sergeant West repeated the statement several times, and thus it was not just informative, but instead was coercive.
A number of courts have found that repeatedly requesting consent is a factor to consider in assessing the voluntariness of consent. E.g., United States v. Raibley, 243 F.3d 1069, 1075-76 (7th Cir.2001); United States v. Pulvano, 629 F.2d 1151, 1157 (5th Cir.1980) (fact that consent is initially refused is a factor to consider); Dotson v. Somers, 175 Conn. 614, 620-21, 402 A.2d 790 (1978) (same); People v. Cardenas, 237 Ill. App.3d 584, 588, 604 N.E.2d 953, 178 Ill.Dec. 430 (1992) (initial refusal is an important factor in determining whether consent is voluntary); State v. Garcia, 250 Kan. 310, 311-12, 827 P.2d 727 (1992) (repeated requests for consent indicate consent was not voluntary); State v. Jackson, 110 Ohio App.3d 137, 143, 673 N.E.2d 685 (1996) (once an initial request for consent is clearly and definitively denied, an encounter takes on a coercive tone where repeated requests are made and colloquy ensues on the issue of police power to search a vehicle). We agree with these courts that repeated requests for consent is another indicator that the consent was not voluntary.
Under the totality of the circumstances, the superior court's ruling that under the Fourth Amendment there was no valid consent to search must be upheld.
Finally, the State argued to the Court of Appeals that the pipe and cocaine were admissible under the inevitable discovery rule despite any constitutional violation. Under this rule, the prosecution must prove by a preponderance of the evidence that the evidence ultimately or inevitably would have been discovered using lawful procedures. See Nix v. Williams, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); State v. Warner, 125 Wash.2d 876, 889 P.2d 479 (1995). The State reasons that it is clear from the record that if Sergeant West had not received consent he would have arrested O'Neill because he had "probable cause to arrest for driving while license suspended/revoked, and also for use of drug paraphernalia." Br. of Appellant at 31. The State reasons that West would then have searched incident to arrest. The State concludes that if West had utilized this "proper and predictable investigatory procedure" the cocaine and pipe would inevitably have been discovered. Id. at 32.
We conclude that the inevitable discovery rule cannot be applied in these circumstances,[11] because it would undermine our holding that a lawful custodial arrest must be effected before a valid search incident to that arrest can occur. If we apply the inevitable discovery rule, there is no incentive for the State to comply with article I, section 7's requirement that the arrest precede the search.

CONCLUSION
No seizure occurred in this case until Sergeant West asked Mr. O'Neill to exit his vehicle so West could check for identification. At that time, the officer had probable cause to arrest Mr. O'Neill for driving while his license was revoked. Since probable cause exceeds the level of justification required for a Terry stop, having O'Neill exit the vehicle was a lawful seizure. The officer then saw the "cook spoon" in plain view. Based upon his experience, the officer recognized it as drug paraphernalia. Accordingly, suppression of the "cook spoon" was not required.
The pipe and cocaine discovered during the search of the vehicle must be suppressed, however. While the officer could have arrested Mr. O'Neill for driving while his license *505 was revoked or, conceivably, for possession of the small amount of controlled substance that the officer believed, in light of his training and experience, he saw on the spoon, the officer did neither. Because a lawful custodial arrest is a prerequisite to a search incident to arrest under article I, section 7, the officer could not search the car incident to arrest until he actually arrested O'Neill. The inevitable discovery rule cannot be applied to circumvent the requirement under article I, section 7 that a lawful custodial arrest must actually occur before a warrantless search incident to that arrest may be conducted. The superior court properly held that there was no valid consent to search of the vehicle.
The Court of Appeals is affirmed in part and reversed in part, and this matter is remanded for further proceedings consistent with this opinion.
SMITH, J.P.T., and JOHNSON, IRELAND, and BRIDGE, JJ., concur.
CHAMBERS, J. (concurring and dissenting).
I concur in part and dissent in part. I concur with the majority that the pipe and the cocaine must be suppressed, and thus far would reverse the Court of Appeals. However, I disagree with the majority that the discovery of the "cook spoon" was properly within an exception to the warrant requirement, and therefore dissent from that portion of the opinion. I also write separately to review our jurisprudence relating to the motives and suspicions of law enforcement officers conducting warrantless seizures. I offer a step by step analysis to be considered for application in questions regarding warrantless seizures of persons arising under article I, section 7 of the Washington State Constitution. Finally, I write separately to emphasize that the majority opinion does not hold that a motor vehicle is a public place just because it is parked in a public place for the purpose of our state constitutional search and seizure analysis.

I. WARRANTLESS SEIZURE ANALYTICAL PROCESS
The analysis I propose has two distinct separate steps. First, the court must determine whether a warrantless seizure of the person within the meaning of article I, section 7 has occurred. Second, the court must determine if the resulting seizure of the person was permissible under article I, section 7. These steps must remain analytically separate. The standard in the first step, whether a seizure has occurred, is objective. The subjective motives, intentions, and suspicions of the law enforcement officer are relevant in the next step, whether the warrantless seizure was permissible under article I, section 7. Compare State v. Young, 135 Wash.2d 498, 501, 510-11, 957 P.2d 681 (1998) with State v. Williams, 102 Wash.2d 733, 739, 689 P.2d 1065 (1984). See also majority at 496.[1]
A. Has a seizure of the person occurred?
A person is seized under article I, section 7 when by means of physical force or a show of authority his or her freedom of movement is restrained such that a reasonable person under the same circumstances would believe that he or she is not free to leave or decline the officer's request and terminate the encounter. Young, 135 Wash.2d at 509-10, 957 P.2d 681, citing with approval United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); State v. Thorn, 129 Wash.2d 347, 352, 917 P.2d 108 (1996). The standard in this first step is "a purely objective one, looking at the actions of the law enforcement officer" from the perspective of the person subject to seizure.[2] *506 Young, 135 Wash.2d at 501, 957 P.2d 681. Furthermore, the defendant has the burden of showing that a seizure occurred under article I, section 7. Young, 135 Wash.2d at 510, 957 P.2d 681. If the officer's actions under the totality of the circumstances objectively amounted to a seizure, then the analysis continues to the next step.
B. Was the seizure of the person permissible under article I, section 7?
It is well settled that article I, section 7 of the Washington State Constitution provides individuals more protection from searches and seizures than the Fourth Amendment to the United States Constitution. State v. White, 135 Wash.2d 761, 769, 958 P.2d 982 (1998). Article I, section 7 provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." Warrants and certain well established principles of common law provide the "authority of law" necessary to justify a seizure. State v. Ladson, 138 Wash.2d 343, 350, 979 P.2d 833 (1999) (citing City of Seattle v. Mesiani, 110 Wash.2d 454, 457, 755 P.2d 775 (1988) and quoting City of Seattle v. McCready, 123 Wash.2d 260, 273, 868 P.2d 134 (1994)). A warrantless seizure of either a person or evidence is per se unreasonable, but certain well established exceptions exist. See State v. Houser, 95 Wash.2d 143, 149, 622 P.2d 1218 (1980). If a valid warrant was issued for the seizure, then the analysis ends. However, if the seizure was made without a valid warrant, then the analysis continues to determine whether the seizure was constitutionally permissible under a recognized exception.
We place the heavy burden on the State to show that seizures (of people or of evidence) fall within one of the limited number of ""`jealously and carefully drawn' exceptions"" to the warrant requirement. Houser, 95 Wash.2d at 149, 622 P.2d 1218 (quoting Arkansas v. Sanders, 442 U.S. 753, 759, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979)). The only exceptions to the warrant requirement are those created by our well established common law principles. McCready, 123 Wash.2d at 273, 868 P.2d 134.[3] While statutes may authorize courts to issue warrants, statutes may not dispense with the warrant requirement because "`[i]t is the court, not the Legislature, that determines the scope of our constitutional protections.'" Ladson, 138 Wash.2d at 352 n. 3, 979 P.2d 833 (quoting In re Pers. Restraint of Maxfield, 133 Wash.2d 332, 345-46, 945 P.2d 196 (1997) (Madsen, J., concurring)).
The officer's subjective reason for seizing an individual is often, but not always, a relevant consideration in determining whether an exception applies. For example, if the applicable common law exception is to render emergency aid or community caretaking or to make a traffic or investigatory stop, then the court must determine the officer's subjective motives. E.g., State v. Loewen, 97 Wash.2d 562, 568, 647 P.2d 489 (1982) (officer must be actually motivated by a perceived need to render aid or assistance); State v. Kinzy, 141 Wash.2d 373, 385, 5 P.3d 668 (2000) (officer's actions must be "totally divorced" from investigation of crime); Ladson, 138 Wash.2d at 353, 979 P.2d 833 (court required to look beyond the formal justification to the actual reason for a traffic stop); State v. Glossbrener, 146 Wash.2d 670, 677, 49 P.3d 128 (2002) (officer's subjective intentions determines scope of permissible seizure). In addition, if the applicable exception is the existence of probable cause and *507 there is evidence of pretext, then the officer's subjective motives and intentions are especially relevant. See State v. Johnson, 71 Wash.2d 239, 242-43, 427 P.2d 705 (1967); accord Ladson, 138 Wash.2d at 357, 979 P.2d 833. I briefly review some established exceptions which may be relevant to the case at bar.
1. Community Caretaking Exception
The community caretaking exception, which recognizes the public's interest in having law enforcement officers assist citizens in a variety of situations, may provide reasonable common law grounds for a warrantless seizure of the person. If the officer responds to apparent health or safety needs of a person or the community and discovers evidence of wrongdoing, then the community caretaking exception might provide the authority of law for a warrantless seizure of the person.[4]
To determine whether the community caretaking exception applies, the court must examine the subjective intent of the officer and determine whether the law enforcement officer's actions leading up to the seizure were "`totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" Kinzy, 141 Wash.2d at 385, 5 P.3d 668 (quoting Cady v. Dombrowski, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973)). If a law enforcement officer's actions are subjectively divorced from a criminal investigation, then the court must weigh the public's interest in having the community caretaking function performed against an individual's interest in freedom from law enforcement intrusion. If the public interest outweighs the individual's interest, then the warrantless seizure was permissible under our state constitution. Kinzy, 141 Wash.2d at 387, 5 P.3d 668.
2. Probable Cause to Arrest Exception
Under the common law exception, officers have the authority to make warrantless arrests where a misdemeanor is committed in the officer's presence or the officer has probable cause to believe the individual committed a felony. State v. Barker, 143 Wash.2d 915, 921, 25 P.3d 423 (2001). Although the legislature has codified situations where an officer may make a warrantless search, we have not yet had occasion to review this codification's constitutionality. See RCW 10.31.100; see also Barker, 143 Wash.2d at 922 n. 3, 25 P.3d 423.
Probable cause to arrest exists when a person of reasonable caution would conclude that the individual has committed a crime based on the facts and circumstances. State v. Graham, 130 Wash.2d 711, 724, 927 P.2d 227 (1996) (quoting State v. Terrovona, 105 Wash.2d 632, 643, 716 P.2d 295 (1986)). The existence of probable cause is determined by an objective standard. Graham, 130 Wash.2d at 724, 927 P.2d 227. However, an officer's decision not to arrest properly ends his authority to search under this exception. Cf. Johnson, 71 Wash.2d at 242-43, 427 P.2d 705; accord Ladson, 138 Wash.2d at 357, 979 P.2d 833.

3. Investigatory Stop Exception
Article I, section 7 permits reasonable investigatory stops. See State v. Little, 116 Wash.2d 488, 497, 806 P.2d 749 (1991). A warrantless seizure will fall within the investigatory stop exception if (1) the law enforcement officer had specific and articulable facts which gave rise to a reasonable suspicion of criminal activity, and (2) the seizure was reasonably related in scope to the specific facts and circumstances that justified the seizure in the first place. State v. Kennedy, 107 Wash.2d 1, 5-6, 726 P.2d 445 (1986); Williams, 102 Wash.2d at 739, 689 P.2d 1065.
An objective standard is used to determine whether the officer's suspicion of criminal activity was reasonable in light of the specific facts and circumstances known to the officer at the time of seizure. Kennedy, 107 Wash.2d at 5-8, 726 P.2d 445. However, whether the scope of the seizure was reasonably related to the circumstances giving rise to the officer's authority may depend on the *508 officer's subjective motives and intentions. See Glossbrener, 146 Wash.2d at 676, 49 P.3d 128 (holding that once an officer decides not to cite an individual for a traffic infraction additional detention must be independently justified).

II. APPLICATION TO MATTHEW O'NEILL
A. Was O'Neill seized under article I, section 7?
I agree with the majority that O'Neill was seized by the time Sergeant West ordered him out of the vehicle. Majority at 499. Objectively viewing Sergeant West's order from O'Neill's perspective, no reasonable person would have felt free to leave or end the encounter at that point. Having concluded that a seizure has occurred, we must go to the next step and determine if the seizure was permissible under article I, section 7.
B. Was the seizure of O'Neill permissible under article I, section 7?
Sergeant West did not obtain a warrant before seizing O'Neill; therefore, we continue with our analysis to determine whether the seizure was permissible under a common law exception to the warrant requirement.
1. Community Caretaking Exception
Although the community caretaking exception recognizes the public interest in having law enforcement officials assist stranded motorists, and O'Neill was a stranded motorist, it is not applicable in this case. Our analysis of the community caretaking exception in this case should begin and end with the first prong: determining whether Sergeant West's actions were totally divorced from an investigative function. See Kinzy, 141 Wash.2d at 385, 5 P.3d 668.
From the beginning Sergeant West's actions were for the purpose of investigating a potential burglary at the minimart. Moreover, there is no evidence that Sergeant West offered to assist O'Neill with his vehicle. Instead, Sergeant West requested that O'Neill start the vehicle and then ordered him out of the vehicle to verify his credibility. Because Sergeant West's actions were investigatory, we need not reach the second prong and weigh the public's interest against O'Neill's interest. Consequently, the community caretaking exception does not provide the authority of law necessary to justify the warrantless seizure of O'Neill.

2. Probable Cause To Arrest Exception
I agree with the majority that objectively Sergeant West had probable cause to believe O'Neill had committed the crime of driving with a revoked license.[5] Majority at 498-99. Probable cause existed because O'Neill informed the officer that he had driven to the spot where his car broke down and that his driver's license had been revoked. RCW 10.31.100 authorizes an arrest for misdemeanors not committed in the officer's presence.[6] However, Sergeant West did not elect to arrest O'Neill for driving with a suspended license. Sergeant West's election not to arrest properly ends any further inquiry into the probable cause to arrest exception. See Barker, 143 Wash.2d at 921, 25 P.3d 423; cf. Johnson, 71 Wash.2d at 243, 427 P.2d 705. As a result, the existence of probable cause to suspect O'Neill of driving with a revoked license does not provide the necessary authority of law to justify the warrantless seizure of O'Neill once the officer decided not to exercise his authority to make that arrest.
3. Investigatory Stop Exception
First, we must determine whether, at the time of the seizure, Sergeant West's suspicion of burglary at the minimart was objectively reasonable. At the time of seizure, it was objectively unreasonable to suspect O'Neill of burglary. O'Neill had explained that he had called a friend and was waiting for help because his car would not start. He *509 was parked near a pay phone, and Sergeant West had witnessed the car's inability to start. Moreover, Sergeant West testified that, at the time of seizure, "[t]here was nothing to indicate that a crime was going on." Report of Proceedings at 24.
Although he testified otherwise, Sergeant West did have reasonable suspicion to believe that O'Neill was involved in criminal activity: driving with a revoked license. In fact, as pointed out by the majority, Sergeant West actually had probable cause to arrest O'Neill for driving with a revoked license had the offense occurred within his presence. As noted by the majority, the existence of probable cause to arrest exceeds the articulable facts and reasonable suspicion standard in the first prong of an investigatory stop analysis. Majority at 499. However, I disagree with the majority's conclusion that the existence of reasonable suspicion ends our investigatory stop analysis. See majority at 499. The majority completely ignores the second prong of our investigatory stop analysis, which requires the seizure to be reasonably related in scope to the reasonable suspicion of criminal activity that justifies the seizure in the first place.
Having determined that the existence of reasonable suspicion for driving with a revoked license existed, our analysis continues to determine whether the seizure of O'Neill was reasonably related in scope to the actual circumstances triggering this common law exception to the warrant requirement. Sergeant West testified that he ordered O'Neill out of the vehicle to verify O'Neill's credibility. The specific and articulable facts which gave rise to Sergeant West's suspicion of criminal activity had nothing to do with driving with a revoked license. It was unnecessary to order O'Neill out of the car to further the investigation for the crime of driving with a revoked license. The seizure of O'Neill to verify his credibility is not reasonably related in scope to driving with a revoked license. As a result, the seizure of O'Neill was not a valid investigatory seizure, and the common law exception does not apply to provide the authority of law necessary to justify the seizure.
I stress that the majority opinion does not hold there is no expectation of privacy in a vehicle, and I join it on that point of law. Although it is less than the expectation of privacy in a home, our prior opinions clearly recognize that individuals have a protected privacy interest in their vehicles. E.g., State v. Parker, 139 Wash.2d 486, 496, 987 P.2d 73 (1999) (acknowledging "our continued recognition of a constitutionally protected privacy interest the citizens of this state have held, and should continue to hold, in their automobiles and the contents therein.").

III. CONCLUSION
I concur with much of the majority opinion. An officer may approach a vehicle and engage in consensual conversation with its occupants, just as an officer may approach a person on the street and engage in consensual conversation. Not every encounter with a law enforcement officer is a seizure. I also concur with the majority's conclusion that the cocaine and the pipe must be suppressed. Our state constitution requires an actual and valid arrest before the search incident to arrest exception applies. Majority at 502. Sergeant West's attentive police work and sharp instincts are commendable. But our constitution does not allow an officer to search and seize without a warrant unless the officer is authorized by one of our common law exceptions to the warrant requirement. If we are to adhere to our precedents, we must suppress evidence seized under no valid exception. I would affirm the trial court's decision.
ALEXANDER, C.J., and OWENS, and SANDERS, JJ., concur.
NOTES
[1] O'Neill says that the Court of Appeals decision conflicts with the decision in State v. Ladson, 138 Wash.2d 343, 979 P.2d 833 (1999). He maintains that Ladson holds that the officer's subjective motivation must be considered in determining the reasonableness of a police intrusion under article I, section 7 of the Washington State Constitution. Ladson did not establish such a broad principle. Ladson involved a stop for a traffic infraction that was pretextual at its inceptionthus, the seizure itself was pretextual. Here, there was no seizure based upon Sergeant West's subjective suspicions. As we explain below, West legitimately approached O'Neill when he was parked in a public parking lot at 1:15 a.m. where the business had been closed about an hour, two burglaries of the business had occurred in the past month, and the car's windows were fogged, indicating it was occupied and had been there for some time. No seizure occurred up to the point West asked O'Neill to exit the car. At that time Sergeant West had probable cause to believe O'Neill was involved in criminal activitynot merely suspicionsince O'Neill said he had driven to the lot and that his driver's license had been revoked.

Moreover, any extension of Ladson to this situation is unwarranted, unduly restrictive of legitimate police activity, and flatly inconsistent with our holding in Young that the question of whether a seizure has been effected in an objective determination based upon the actions of the law enforcement officer.
[2] The public nature of the encounter is addressed below.
[3] Although O'Neill now indicates that Sergeant West told him to prove that the car would not start, if O'Neill disagreed with the superior court's finding on this point, it was up to him to challenge it. He has not done so.
[4] State v. Larson, 93 Wash.2d 638, 611 P.2d 771 (1980), cited by O'Neill, also does not dictate that the request for identification was unconstitutional under article I, section 7. Larson never discusses article I, section 7 independently of the Fourth Amendment, and Young, which does address article I, section 7, is to the contrary.

Larson is also factually distinguishable because it concerns a request for a passenger's identification after the driver was lawfully stopped, unlike this case.
[5] Sergeant West conducted a pat down search for identification. O'Neill does not raise any issue regarding the propriety of the pat down search itself.
[6] In 1990, the United States Supreme Court eliminated a third requirement, i.e., that the officer's discovery of the evidence be inadvertent. Horton v. California, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).
[7] The Court has said that there must be probable cause for the seizure of the item, which it has described as a flexible, common-sense standard. Texas v. Brown, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). The Court said that "[a] `practical, nontechnical' probability that incriminating evidence is involved is all that is required." Id. (quoting Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)).
[8] Sergeant West could not have lawfully arrested O'Neill for possession of drug paraphernalia or use of drug paraphernalia in any event. Possession of drug paraphernalia is not a crime, and West could not have arrested for possession of the "cook spoon." See RCW 69.50.412; State v. McKenna, 91 Wash.App. 554, 563, 958 P.2d 1017 (1998). While use of drug paraphernalia is a misdemeanor, RCW 69.50.412(1), there is no evidence that the "cook spoon" was used in West's presence. Thus, the officer could not have arrested O'Neill for use of the drug paraphernalia because he could not arrest for this misdemeanor if it was not committed in his presence. See RCW 10.31.100.
[9] There is thus no reason for a Gunwall analysis here. See State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986).
[10] This holding does not affect the validity of the limited pat down search exception permissible under Terry, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.
[11] We leave for another case the question whether the rule might apply in another context under article I, section 7, a question we have not decided.
[1] In some instances the first step will be to determine whether the defendant has standing to challenge the law enforcement action. See, e.g., State v. Jones, 146 Wash.2d 328, 45 P.3d 1062 (2002); State v. Williams, 142 Wash.2d 17, 11 P.3d 714 (2000); State v. Carter, 127 Wash.2d 836, 904 P.2d 290 (1995). However, there is no doubt that individuals have a legitimate expectation of privacy in themselves. Consequently, when the object seized is the individual, the individual has standing to challenge the seizure. Cf. Carter, 127 Wash.2d at 841 n. 5, 904 P.2d 290 (citing United States v. Salvucci, 448 U.S. 83, 86-87, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980)).
[2] The standard to determine whether a seizure has occurred under the Fourth Amendment is subjective when there is an absence of physical force but a show of authority. California v. Hodari D., 499 U.S. 621, 625, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). The federal test focuses on the actions of the defendant; for a seizure to occur the defendant must have submitted to a show of authority. Id. at 626, 111 S.Ct. 1547. Washington has rejected the use of a subjective test to determine whether a seizure has occurred under article I, section 7. Young, 135 Wash.2d at 510, 957 P.2d 681; see also Charles W. Johnson, Survey of Washington Search and Seizure Law: 1998 Update, 22 SEATTLE U.L.REV. 337, 367-69, 438 (1998).
[3] Cf. State v. Barker, 143 Wash.2d 915, 921, 25 P.3d 423 (2001) (recognizing a legislative attempt to codify and potentially expand common law principles by RCW 10.31.100). Barker should not be read to establish legislative authority to abrogate constitutional protections. Because the RCW 10.31.100 issue was decided on statutory grounds, we properly did not reach the constitutional issue.
[4] We have noted that valid community caretaking functions include delivering emergency messages, giving directions, searching for lost children, assisting stranded motorists, and rendering first aid. Kinzy, 141 Wash.2d at 387, 5 P.3d 668.
[5] It is a gross misdemeanor to drive a motor vehicle in this state while one's license is revoked. RCW 46.20.342(1)(b).
[6] This case does not present an opportunity to examine the constitutionality of RCW 10.31.100. Insofar as the statute authorizes warrantless seizures for misdemeanors not committed in an officer's presence, its constitutionality is suspect. I assume without deciding that the statute is constitutional.